IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THEODOR WUKOVICH, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-435 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Theodor Wukovich, Jr., and Defendant Michael J. Astrue, Commissioner of Social Security.[1]  Plaintiff seeks review of a final decision by the Commissioner denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.[2]  For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

---

[1]    Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

[2]    To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.  42 U.S.C. § 423(a).  The Commissioner does not dispute that Mr. Wukovich satisfied these non-medical requirements.

## II. BACKGROUND

### A. Factual Background

According to a disability report completed on August 1, 2002, Theodor Wukovich injured his right knee in August 1995 while working as a heavy equipment operator for a coal mining company. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 4, "Tr.," at 64, 70, 496.) In October 1995, Dr. Thomas Brockmeyer, an orthopedic surgeon, performed arthroscopic surgery on his knee; Plaintiff recovered without significant difficulty and returned to work. After he re-injured the same knee, Mr. Wukovich underwent a second surgery in September 2000, followed by a course of physical therapy. Although he returned to work in November 2000, by January 2001, he was experiencing considerable pain and swelling in his knee. (Tr. 134.) Mr. Wukovich stopped working as of March 26, 2001.

Following an unsuccessful course of conservative treatment by Dr. Brockmeyer (intra-articular steroid injections, non-steroidal anti-inflammatory drugs, and two courses of analgesic injections), Plaintiff underwent a complete arthroplasty (knee replacement) on October 9, 2001. (Tr. 134-135.) One year later, a physical examination showed that he "ambulated fairly normally," his knee examinations were "unremarkable," with a normal range of motion in his left knee and only "very mild limitation" in his right knee.

Plaintiff began to experience lower back pain sometime before

2

April 2002, when he consulted with Dr. James Solan, a general practitioner. (Tr. 368.) X-rays of his spine taken in September 2002 showed spondylolosis[3] of the transitional lumbosacral vertebrae and some mild degenerative signs. (Tr. 376.) An MRI performed in January 2003 showed a herniated nucleus pulposus at the L4-5 interspace, but no spinal stenosis[4] or other significant abnormality. (Tr. 375.)

On August 6, 2002, Mr. Wukovich protectively filed an application for disability insurance benefits with the Social Security Administration ("SSA"), alleging disability as of March 26, 2001, due to his knee injury, arthritis in his back, blindness in his left eye,[5] and high cholesterol. (Tr. 53-56.) When his application was denied by the Social Security Administration (Tr. 37-42), Mr. Wukovich appealed. Following a hearing before an Administrative Law Judge ("ALJ"), the judge denied benefits in a decision dated October 27, 2003 (Tr. 245-254), which was affirmed by the Social Security Appeals Council on April 23, 2004. (Tr. 262-266.) Mr. Wukovich did not seek review of that decision in the district court. (Tr. 34.)

---

[3] Spondylolysis refers to disintegration or dissolution of a vertebra due to osteoarthritis. *See* DORLANDS ILLUSTRATED MEDICAL DICTIONARY ("DORLANDS") at www.mercksource.com., last visited April 10, 2007.

[4] Spinal stenosis is defined as "the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." *See* DORLANDS.

[5] Mr. Wukovich had been blind in his left eye for some 20 years as the result of a retinal infection following surgery. (Tr. 209.)

B.    Procedural Background

On April 2, 2004, Mr. Wukovich filed a second application for DIB, alleging disability as of October 28, 2003, due to his right knee injury, arthritis in his back, high cholesterol, and blindness in his left eye.  (Tr. 293-296.)

On July 21, 2004, the SSA advised Mr. Wukovich it had concluded he was not disabled.  (Tr. 268-272.)  Plaintiff timely requested a hearing, which was held before Judge Douglas Abruzzo on October 5, 2005, where Plaintiff was represented by counsel.  Judge Abruzzo issued his decision on October 12, 2005, again denying benefits.  (Tr. 16-27.)  Following Mr. Wukovich's timely appeal, the Social Security Appeals Council informed Mr. Wukovich on March 6, 2006, that it declined to review the ALJ's decision, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support the ALJ's findings.  (Tr. 9-12.)  Therefore, the October 12, 2005 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed suit in this Court on April 5, 2006, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that

an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d

Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[6] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(I); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

---

[6]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

6

To determine a claimant's rights to DIB,[7] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)  if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)  if the claimant retains sufficient residual functional capacity ("RFC")[8] to perform his past relevant work, he is not disabled; and

(5)  if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts

---

[7]  The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under either type of benefits.

[8]  Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) .  Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

7

to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[9] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

After setting out clearly and correctly the prescribed analysis (Tr. 17-18), Judge Abruzzo first concluded that Mr. Wukovich had not engaged in substantial gainful activity since his alleged onset date of October 28, 2003. (Tr. 18.) In resolving step two in Plaintiff's favor, the ALJ found that he suffered from several "severe" impairments as that term is defined by the SSA, i.e., the residual effects of total right knee arthroplasty, degenerative disc disease of the lumbar spine, obesity, and blindness in his left eye. (Tr. 18-19.) He also concluded that although Mr. Wukovich had a history of hypertension and headaches, those conditions were well controlled by medication and, consequently, were not severe inasmuch as they did not have more than a *de minimis* effect on his ability to perform basic work activities. (Tr. 19.) Similarly, although Plaintiff had been diagnosed with bilateral carpal tunnel syndrome in May 2005, the evidence did not reveal that this condition limited his ability to perform fine and dexterous movements with his hands, and thus was also determined not to be severe. (Tr. 19-20.)

---

[9] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

At step three, the ALJ concluded none of Plaintiff's impairments satisfied any of the criteria in the relevant Listings, i.e., Listing 1.00 (musculoskeletal impairments) or Listing 2.00 (impairments of special senses, e.g., vision.) (Tr. 20.) At step four, the ALJ concluded Mr. Wukovich could not perform his past relevant work as a security guard, drywall laborer/finisher, construction carpenter/laborer, or coal mine worker. The first three positions were described by Mark Heckman, the vocation expert ("VE") who testified at the hearing, as semi-skilled and requiring a light to heavy level of exertion; the coal miner position was described as very heavy skilled labor. (Tr. 24.) However, relying on Mr. Heckman's testimony, the ALJ concluded that Plaintiff was capable of performing light work with several postural and other limitations as well as a range of sedentary work. (Tr. 25-26.) Unskilled, light exertional positions available in the local and national economies, according to the VE, included ticket seller, blood donor unit assistant, and coupon redemption clerk; sedentary, unskilled positions included product inspector, ampoule sealer, and food order clerk. (Tr. 25.) Therefore, based on his status as a "younger" individual[10] as of the alleged onset date of his disability, with a high school education, a semi-skilled work history, and no transferable skills, together with the medical

_____

[10]   Plaintiff was 48 years old as of his alleged onset date, October 28, 2003, making him a younger person according to Social Security regulations, i.e., under 50 years old.  20 C.F.R. § 404.1563(c).

evidence of record and the testimony of the VE, the ALJ determined at step five that Mr. Wukovich was not disabled and, consequently, not entitled to benefits.  (Tr. 26.)

B.   Plaintiff's Arguments

We turn to each of the three arguments raised by Plaintiff contending that the ALJ erred in this analysis.

1.   *The ALJ erred by concluding at step five of his analysis that there were a significant number of jobs Plaintiff could perform:*  Mr. Wukovich first argues that the jobs identified by the VE at the light exertional level required standing and walking for six hours a day, whereas the hypothetical question limited him to jobs which required no more than four hours a day in those activities.  The jobs cited do not comply, therefore, with the ALJ's hypothetical question and his conclusion that Mr. Wukovich could perform a range of light-level jobs was not based on substantial evidence.  The error was compounded by the fact that Mr. Heckman's testimony conflicted with the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") and the ALJ did not request the VE to resolve that conflict nor resolve it himself in his written opinion.  Consequently, Plaintiff argues, remand is necessary pursuant to Social Security Ruling ("SSR") 00-4p[11] and

---

[11]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1).  "Rulings do not have the force and effect of the law or regulations but are to be relied

10

Boone v. Barnhart, 353 F.3d 203 (3d Cir. 2003).  (Plaintiff's Brief

in Support of Motion for Summary Judgment, Doc. No. 8, "Plf.'s

Brief," at 9-10.)

At the hearing, the ALJ asked the following hypothetical

question:

> Please consider for me a hypothetical person, of the same
> age, education and work experience as the claimant.  This
> person is limited to no more than the light range of
> exertion as that is defined in our regulations.   This
> person is limited to no more than occasional stooping and
> climbing of ramps and stairs.  This person must avoid all
> balancing...all kneeling, crouching and crawling [, and]
> all climbing of ropes, ladders or scaffolds.
>
> If you consider any sedentary occupations, they must be
> compatible with a sit/stand/walk option.   I'm defining
> walk here as no more than five steps away from the work
> station,  performing  a  stretching  or  pain  reduction
> maneuver,  returning  to  the  work  station  within  one
> minute, and doing this no more than five times per hour.
>
> This person must avoid pushing and pulling with the lower
> left extremity,[12] [i]ncluding no operation of foot pedals
> at all.  This person must avoid frequent, fine fingering.
> By that what I mean is, the placing of small pieces in
> precise locations....  And that's none whatsoever, avoid
> that all together....
>
> The  person  must  avoid  prolonged  exposure  to  cold
> temperature extremes and extreme wetness or humidity.  The
> person is limited to occupations which do not require
> binocular  visual  acuity...and  which  do  not  require
> exposure to dangerous machinery and unprotected heights.

.   .   .   .

---

upon as precedents in determining other cases where the facts are
basically the same."   Sykes, id., quoting Heckler v. Edwards, 465 U.S.
870, 873 n3 (1984).

[12]   This reference to Mr. Wukovich's left leg is an obvious – but
harmless – error inasmuch as the evidence is clear that the knee
replacement was performed on his right leg.

Let me add to this. Limited to no more than four hours of walking out of an eight-hour shift. Combination walking and standing.

(Tr. 524-526.)

According to Social Security regulations, light work

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.[13] Social Security regulations further provide that "light work generally requires the ability to stand and carry weight for approximately six hours of an eight hour day." *See* Jesurum v. Sec. of Health & Human Servs., 48 F.3d 114, 119 (3d Cir. 1995), *citing* SSR 83-10, "Determining the Capability to Do Other Work: The Medical-Vocational Rules of Appendix 2." SSR 83-10 also

---

[13] Social Security regulations classify jobs in one of five categories depending on the physical exertion they require: sedentary, light, medium, heavy, and very heavy. As noted, the ability to perform light work subsumes the ability to perform most sedentary work, i.e., work which involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. SSR 83-10. The definitions of the five categories of exertional level used by the SSA are the same as those used in the DOT. SSR 00-4p.

explains that

> "Frequent" means occurring from one-third to two-thirds
> of the time.  Since frequent lifting or carrying requires
> being on one's feet up to two-thirds of a workday, the
> full range of light work requires standing or walking,
> off and on, for a total of approximately 6 hours of an 8-
> hour workday.

SSR 83-10.

The critical point here is that the ALJ did not find Mr.
Wukovich capable of performing the *full* range of light work, but
rather only light work which excluded many postural requirements
(such as balancing, kneeling, crouching, crawling and most
climbing) and took into account Mr. Wukovich's lack of binocular
vision, his need to make frequent shifts between sitting, standing,
and walking to accommodate his back and knee pain, and his
inability to use his right leg to manage machine controls.    As
Ruling 83-10 further recognizes, frequent "carrying" of objects
(implying walking from place to place) may be required from one-
third to two-thirds of an eight-hour workday, roughly three to six
hours.    That is, six hours of standing and walking is the maximum,
not the minimum requirement, contrary to Plaintiff's argument.   As
Defendant points out, "there is nothing oxymoronic in finding that
a plaintiff can perform a *limited* range of light work," i.e., that
he can perform some, though not all, of the exertional functions of
a specific range or, as is the case here, he can perform the
required function (walking or standing) at a level less than that
required to perform a full range of work.    (Defendant's Brief in

13

Support of Motion for Summary Judgment, Doc. No. 10, at 13, *quoting* Santiago v. Barnhart, 367 F. Supp.2d 728, 733 (E.D. Pa. 2005).)

"The Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT]. . . and often relies upon it at steps four and five of the evaluation process." Burns, 312 F.3d at 126, *citing* 20 C.F.R. § 416.966(d). Social Security Ruling 00-4p, "Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions," requires an ALJ to identify and obtain a reasonable explanation for conflicts between occupational evidence provided by a VE and information in the DOT, and to explain in his decision how such conflicts have been resolved.

Plaintiff does not clarify how he arrives at the conclusion that the three light-level jobs identified by the Vocational Expert - ticket seller, blood donor unit assistant, and coupon redemption clerk - cannot be done by someone who is capable of standing or walking only four hours a day. Nor are we persuaded by his reliance on Boone v. Barnhart. In that case, the ALJ concluded that the claimant's RFC allowed her to perform a range of unskilled light level work as long as she could exercise a sit/stand option every thirty minutes to accommodate her back and knee impairments and was not required to perform repetitive hand activity due to carpal tunnel syndrome. Boone, 353 F.3d at 204. The VE who

14

testified at the hearing identified inventory clerk, home health aide, and sales counter clerk as unskilled, light level jobs. Id. at 205.

On appeal, the United States Court of Appeals for the Third Circuit held that the ALJ had erred by accepting the VE's testimony. The VE's conclusion that Boone could work as an inventory clerk was erroneous on two counts: first, the position was rated in the DOT as a medium-level job, and second, it required a "specific vocational preparation," i.e., skill level, of 4, which equates to semi-skilled work. Boone, 353 F.3d at 206-207. Similarly, the position of home health aide was defined in the DOT as a medium-level, semi-skilled job. When questioned at the hearing on this point, the VE noted that the home health aide position could offer "various levels" of care, including some which could be performed at the light level, but she did not indicate if the position could be done at an unskilled rather than semi-skilled level. Id. at 207. Finally, the Court pointed out that the DOT does not contain a job described as "sales counter clerk." A similar job, "sales clerk" is performed at the semi-skilled level, again precluding Boone from consideration. Another possible position, "sales attendant," requires frequent reaching, handling and fingering and an inability to sit and stand at will, requirements which should have precluded this occupation from the ALJ's consideration. Id. The Court of Appeals therefore concluded

15

that the ALJ had erred by accepting the VE's testimony that these occupations satisfied his hypothetical question or, alternatively, had erred by failing to explain why the VE's testimony was appropriately relied upon despite the conflict between the requirements of the occupations and the limitations of the question.  Id. at 208.

None of the inconsistencies presented in Boone are present when we compare Judge Abruzzo's hypothetical question and the jobs chosen by the vocational expert.  All of the jobs described by Mr. Heckman are defined in the DOT as light, unskilled occupations.[14]

(See Tr. 452, 456, and 460.)  None of them requires the postural abilities, operation of machinery controls with the legs, or exposure to certain environmental conditions which were excluded by the ALJ in his hypothetical question.  (See Tr. 454, 458, and 462.) While all three positions require at least frequent movement of the fingers and arms, i.e., reaching, handling and fingering, they do not involve fine fingering which the ALJ defined as "placing of small pieces in precise locations," nor do they require binocular visual acuity.  (Id.)  Finally, there is nothing in the descriptions to establish that these jobs require standing and walking more than four hours a day.  In fact, with a few exceptions

---

[14]   Plaintiff did not provide the DOT descriptions with his brief in support of the motion for summary judgment, but they are included with a letter from Mr. Wukovich received by the Appeals Council on December 15, 2005.  (See Tr. 452-462.)

16

such as serving refreshments to donors to prevent or alleviate adverse effects of giving blood, taking inventory, or arranging stock, the specific tasks incorporated in these descriptions appear to be such that they can be performed standing or sitting, with little or no walking or carrying required.

In posing a hypothetical question, the ALJ "must accurately convey to the vocational expert all of a claimant's credibly established limitations." Rutherford, 399 F.3d at 554. Plaintiff does not contend that the ALJ failed to comply with this directive. The jobs identified by the VE are described in the DOT as being light, unskilled positions; that is, there was no conflict between the exertional requirements of the jobs and the limitations set out in the hypothetical question as there was in Boone. Thus, there was no conflict between the VE's testimony and the DOT descriptions which the ALJ was required to resolve. Consequently, the VE's testimony constitutes substantial evidence on which the ALJ properly relied in completing step five of the analysis. *See* Rutherford, id.

2. *The ALJ erred in his determination of Plaintiff's credibility:* Mr. Wukovich argues that the ALJ erred by concluding in his written decision that Plaintiff's subjective complaints were inconsistent with the totality of the evidence of record, in particular, the ALJ's conclusion that his testimony regarding the severity of his impairments was not entirely credible. This error

17

was compounded by the ALJ's statement on the record at the hearing

that he found Plaintiff's testimony to be credible.  (Plf.'s Brief

at 10-12.)

In her closing argument at the hearing, counsel for Plaintiff

noted Mr. Wukovich's

significant work history which would enhance[ ] the
credibility of his assertion...that he can't do any work
on a full time basis. He also...has some attempts after
the mine closed to re-educate, return to the job market.
Unfortunately, those were...unsuccessful.

(Tr. 529.)  In response, the ALJ noted

.... And let me please point out that I don't find your
claimant non-credible at all. I think pretty generally
he is quite credible and I agree, I did review his work
history and it is pretty impressive.

(Tr. 530.)  He further commented that at this stage, he was not

sure whether the grids[15] applied or "how the interplay of these

impairments would affect his ability overall. . . . And I'm going

to have to take a careful look at that."   (Tr. 530.)

In his written opinion, the ALJ correctly noted that

determination of a witness's credibility is an issue reserved to

---

[15]   The Medical-Vocational Guidelines (informally referred to as
the "grids"), found in three tables at 20 C.F.R., Part 404, Subpart P,
Appendix 2, are used in Step 5 of the ALJ's analysis together with
evidence presented by a vocational expert and the determination of the
claimant's residual functional capacity.  These administratively-
noticed rules compare the claimant's age, education, transferable work
skills, and his maximum sustainable work capability at the sedentary,
light, or medium level.  20 C.F.R. § 404.1569.  Application of the
grids simplifies and expedites determination of a claimant as
"disabled" or "not disabled."  Where the claimant also demonstrates
non-exertional limitations such as pain or mental impairments, use of
the grids alone is not appropriate.  Sykes, 228 F.3d at 267 (internal
quotations and citations omitted).

the Commissioner. (Tr. 22; *see also* Landeta v. Comm'r of Soc. Sec., No. 05-3506, 2006 U.S. App. LEXIS 20905, *16 (3d Cir. Aug. 14, 2006), noting that "the Commissioner has discretion to evaluate the credibility of the complaints and draw a conclusion based upon medical findings and other available information.") He then stated that an ALJ "may properly challenge the credibility of a claimant who asserts eligibility based on the subjective evidence. When so evaluated, the claimant's subjective complaints are found to be inconsistent with the totality of the evidence." (Tr. 22.)

Plaintiff raises three arguments in this regard. First, he argues that an ALJ may not make one decision as to credibility on the record at the hearing and then make a contradictory credibility finding in his decision. (Plf.'s Brief at 12.) Mr. Wukovich cites no case law for this proposition and the Court's independent research has failed to find such support. Moreover, we note that the ALJ's credibility finding at the hearing was not quite so clear-cut as Plaintiff argues. Following the remarks quoted above, Judge Abruzzo stated that after he determined the facts of the case, he would "sit down with the 1500 pages of rules that the commissioner has given us. . . . We are going to draft a legal decision which is going to incorporate the facts that I find and how the law affects or acts on those particular facts." (Tr. 530-531.) A statement that Mr. Wukovich was "quite credible" at the hearing does not preclude the ultimate decision that his subjective

19

complaints were inconsistent with the totality of the evidence once the ALJ was able to systematically review the evidence vis-a-vis the testimony.

Neither do we accept the alternative argument that the ALJ erred by relying on Plaintiff's "sporadic activities of daily living" to support the conclusion that he was not disabled and "totally fail[ed] to perform the credibility analysis required by Social Security Ruling 96-7p in assessing the credibility of the claimant's subjective complaints." (Plf.'s Brief at 12.)

Social Security Ruling 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," and 20 C.F.R. § 404.1529(c)(3) explicitly set out the factors an ALJ must consider when a claimant's subjective symptoms suggest a greater severity of impairment than can be shown by objective medical evidence alone, i.e., the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors which precipitate or aggravate the symptoms; medication taken to alleviate the symptoms and the side effects thereof; treatments other than medication; and other factors concerning functional limitations.

Here, the ALJ first summarized Mr. Wukovich's subjective complaints regarding the limitations imposed by his knee replacement and back pain. (Tr. 22.) He then systematically considered Plaintiff's testimony that these impairments limited him

20

to sitting no more than 30 to 45 minutes, standing 20 minutes, and walking 30 minutes before having to sit.  Finally, he compared those subjective complaints to the medical evidence; Plaintiff's self-reported activities of daily living ("ADL"); his medications and their side effects; and treatment other than medication.  (Tr. 22-24.)   In short, the ALJ's conclusion did not, contrary to Plaintiff's arguments, depend solely on his activities of daily living, but rather complied entirely with Social Security regulations directing how subjective complaints are to be evaluated.

Finally, Plaintiff argues that the ALJ's evaluation failed to consider his work record and his attempts to re-educate himself and return to work.  (Plf.'s Brief at 11-12.)  At the hearing, the ALJ commented that he found Plaintiff's work history "pretty impressive."  (Tr. 530.)  In his decision, he noted Plaintiff's "consistent work record," but also pointed out that Mr. Wukovich "testified he stopped working in 2001 when the mine shut down." (Tr. 24.)

Here, Plaintiff's work history and earnings record show that he worked consistently from 1972 through 2001, primarily in coal mining (with a few periods which may reflect mine closures or strikes), in construction, and as a security guard.  (Tr. 338-345; 63-68.)  Although he originally indicated he stopped working as of March 26, 2001, because of his knee injury (Tr. 70), he testified

21

at the hearing that he stopped working "when they shut down the mine" permanently following a fire. (Tr. 496.)[16]

As Plaintiff correctly notes in his brief, when a claimant "has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility." (Plf.'s Brief at 11, quoting Tabron v. Harris, 667 F.2d 412, 415 n6 (3d Cir. 1981); see also Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).) However, a claimant's prior work history is only one of many factors an ALJ must consider in determining credibility (see 20 C.F.R. § 404.1529(c)), and a long work history does not necessarily equate with credibility. See Brubaker v. Barnhart, CA No. 05-76, 2005 U.S. Dist. LEXIS 36790, *12 (E.D. Pa. Dec. 29, 2005). There is no requirement that the ALJ defer to a claimant's testimony as to his ability to work, as long as the ALJ makes clear that he gave such testimony "serious consideration" and makes specific findings of fact as to credibility. Rowan v. Barnhart, No. 02-3507, 2003 U.S. App. LEXIS 10827 *12 (3d Cir. May 13, 2003), citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), and Burns, 312 F.3d at 129.

---

[16] It appears both of these statements may actually be true. Dr. Brockmeyer's notes show that Mr. Wukovich was treated on March 26, 2001, after he re-injured his knee; his physician limited him to sedentary work and stated that if Plaintiff had to undergo a total knee replacement, he could not safely return to the mine thereafter. (Tr. 192.) However, he made several attempts to return to work after his surgery, probably through January 8, 2002. (See, e.g., Tr. 178, 180, 181, 234.) The mine may have closed sometime between January 2002 and February 2003 according to Dr. Kanabarow's notes. (Tr. 234.)

The medical evidence here clearly supported the ALJ's conclusion that Mr. Wukovich was capable of light and/or sedentary work. *See*, for example, notes by Drs. Brockmeyer and Alexander Kandabarow (Dr. Brockmeyer's partner) to that effect at Tr. 178-179 and Tr. 232, respectively. Moreover, contrary to Plaintiff's contention, the ALJ did not fail to consider his efforts to return to work. Plaintiff's testimony at the hearing on this subject indicated that he had attempted to re-train as a building inspector but was unsuccessful because such positions not only required an engineering degree, they also involved climbing ladders, which he had been prohibited from doing by his physicians. (Tr. 511.) Also contrary to Plaintiff's argument, the ALJ did discuss the conclusion by the Office of Vocational Rehabilitation ("OVR") that Mr. Wukovich was not capable of competitive employment. A rehabilitation counselor stated in a letter dated May 26, 2005, "Despite sincere efforts by yourself and OVR, it does not appear that you are able to engage in competitive employment at this time due to your health." (Tr. 262.) As the ALJ pointed out, this conclusion that Mr. Wukovich's health prevented him from working is not supported by clinical or objective findings (Tr. 24) and is contradicted by the medical opinions noted above. There is no indication that Mr. Wukovich attempted to train in alternative positions, nor is there any indication that he appealed OVR's decision to close his file, a process which is clearly described in

the same letter.

A reviewing court generally defers to an ALJ's credibility determination because the ALJ has an opportunity at the hearing to assess the demeanor of the witness. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). Where there are discrepancies between the claimant's own testimony and the medical records and where the ALJ points to the medical evidence which disproves the claimant's subjective testimony, an ALJ's finding that the witness was not entirely credible is to be considered as supported by substantial evidence. Williams v. Barnhart, No. 02-4513, 2004 U.S. App. LEXIS 412, *6-*8 (3d Cir. Jan. 12, 2004). Based on the ALJ's thorough and systematic review of Plaintiff's testimony, the medical evidence and other evidence of record, we find no error by the ALJ in assessing Plaintiff's credibility.

    3.    *The ALJ erred in finding that Plaintiff's migraine headaches, bilateral carpal tunnel syndrome, and hypertension were not severe impairments:* As summarized above, at step two of the five-step analysis, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. Under Social Security regulations, an impairment is "severe" only if it "significantly limits [the claimant's] physical ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities include the physical "abilities and aptitudes necessary to do most jobs," for example, walking, standing, sitting, lifting, pushing,

24

pulling, reaching, carrying or handling as well as seeing, hearing, and speaking. 20 C.F.R. §§ 404.1521(b) and 140.1521(b). A claimant satisfies step two of the analysis by demonstrating that the impairment is more than "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (citations omitted); see also SSR 85-28, "Medical Impairments that are not Severe." Reasonable doubts on severity are to be resolved in favor of the claimant. Newell, id. at 547.

Here, the ALJ determined that three of Mr. Wukovich's impairments -- high blood pressure, migraine headaches and bilateral carpal tunnel syndrome – were not severe. Plaintiff contends that the ALJ erred in "summarily concluding" that these impairments were not severe inasmuch as they had more than a minimal effect on his ability to perform basic work activities, particularly his ability to maintain a normal work schedule without excessive breaks and absences and his ability to remain on task for an entire workday. (Plf.'s Brief at 13.)

Regarding Plaintiff's hypertension, Judge Abruzzo noted several blood pressure readings between May 2004 and June 2005 which were in the range of 169/60 to 130/84. (Tr. 19.) He noted that the medical evidence did not reflect signs of cardiac decompensation such as congestive heart failure, end organ damage,

significantly elevated blood pressure, arrythmias or syncope. (Id.) At the hearing, Mr. Wukovich testified that he had been on high blood pressure medication for six months before hearing, i.e., since early 2005 (Tr. 503), well after his alleged onset date, October 2003. He also testified that Dr. Solan had not told him his blood pressure level was dangerously high or, conversely, that it was "pretty good." (Tr. 504.) He did not indicate at the hearing that his ADL were in any way negatively affected by his high blood pressure.

According to Dr. Solan's notes, by March 21, 2005, Plaintiff's blood pressure was "much better [with] Inderal LA.[17]  (Tr. 447.) Specifically, his blood pressure had gone from 160/100 on February 7, 2005, to 130/80 on March 21, 2005.[18]  (Id.) Dr. Solan's notes do not include any references to exertional limitations resulting from elevated blood pressure, nor is there any reference to hospitalization or other emergency treatment for hypertension.

Similarly, the evidence of Mr. Wukovich's migraine headaches is minimal and there is no medical evidence to support a conclusion that they were severe. At an examination by the state-agency physician, Henry Holets, on May 26, 2004, Mr. Wukovich reported a

---

[17]  Inderal LA (propranolol) is used to treat high blood pressure and abnormal heart rhythms and to prevent angina (chest pain), heart attacks, migraine headaches and tremors. See www.nlm.nih.gov/medlineplus, last visited April 10, 2007.

[18]  Plaintiff's blood pressure on March 21, 2005, may actually have been 130/89 or 130/84; the handwritten notes are nearly illegible.

"history of headaches" and blurred vision, but did not describe the headaches as migrainous in nature or severe. (Tr. 409.) Plaintiff began complaining of severe headaches in the frontal area of his head sometime in July 2004. (Tr. 433.) He subsequently underwent a CT scan[19] of his head on August 24, 2004, which was normal other than detecting a polyp in his sinus. (Id.)

At the hearing, Mr. Wukovich reported that as of his alleged onset date (October 28, 2003), migraine headaches, diagnosed by Dr. Solan, were his third most serious problem. (Tr. 499.) However, the Court is unable to find any notes by Dr. Solan regarding migraine headaches before February 7, 2005. (Tr. 447.) Plaintiff also testified that his migraine headaches occurred "two or three times a month," sometimes more frequently. (Tr. 518.) When he felt a headache coming on, he took Imitrex,[20] which worked "fairly well," assuming he took it as soon as possible. He would then lie

---

[19] According to the medical literature, migraine headaches are not diagnosed through a CT scan or other testing device. See the on-line edition of the MERCK MANUAL at www.merck.com, "Migraines," last visited April 10, 2007, noting that "migraines are diagnosed on the basis of symptoms. No procedure can confirm the diagnosis. If headaches have developed recently or if the pattern of symptoms has changed, computed tomography (CT) or magnetic resonance imaging (MRI) of the head is performed to exclude other diagnoses." Id.

[20] Imitrex (sumatriptan) is a selective serotonin receptor agonist used to treat the symptoms of migraine headaches but does not prevent migraine attacks. See www.nlm.nih.gov/medlineplus, last visited April 10, 2007. It is unclear from the record if Plaintiff was taking Inderal or Imitrex or both for his migraine headaches. Compare this testimony with Dr. Solan's records of March 21, 2005, noting that Plaintiff's migraines had improved with Inderal, but indicating he was also taking Imitrex. (Tr. 447.)

down until the headache subsided, usually in about half an hour. (Tr. 500, 519-502.)  Over time, his headaches had not improved, but neither had they become worse.  (Tr. 505.)  There is no evidence in the medical record that he received other specialized or emergency treatment for severe headaches and Dr. Solan had not recommended that he consult a neurologist.  (Tr. 503.)

Dr. Solan's notes do not include references to exertional limitations caused by migraine headaches or side effects commonly associated with such headaches, e.g., vomiting or sensitivity to light or sound. (*But see* Tr. 353 where Plaintiff reported that hot humid weather caused headaches and nausea.) An ADL questionnaire completed on April 27, 2004 (i.e., after his alleged disability onset date), does not mention migraine or any other severe headaches. (Tr. 346-352.) In a report updating his recent medical treatment and medications completed on October 19, 2004, Mr. Wukovich reported that he was taking Imitrex for "headaches" as needed.  (Tr. 360-361.)

Finally, Mr. Wukovich reported that he had been diagnosed with carpal tunnel syndrome in both wrists in 2004.  (Tr. 502.)  At the consultative examination on May 26, 2004, Mr. Wukovich was able to flex his wrists backward 50 degrees and toward the palm 70 degrees (Tr. 411), and did not mention pain or numbness in his wrists. When Plaintiff reported on May 12, 2005, that he had been experiencing numbness and tingling in his arms, "for a while," Dr.

Solan directed him to sleep wearing "cock-up splints." (Tr. 445.) Dr. Solan did not recommend that Plaintiff consult with a neurologist or neurosurgeon, but suggested in June 2005 that he discuss the problem with Dr. Brockmeyer. (Tr. 502, 446.) However, neither Dr. Brockmeyer nor Dr. Kandabarow mentions such complaints in his notes. Again, there is no mention of this impairment in his April 2004 ADL questionnaire nor in his report of recent medical treatment in October 2004. At the hearing, Mr. Wukovich testified that he was still experiencing pain in his wrists, particularly when he tried to do fine work, such as helping his grandson paint building blocks for more than half an hour. (Tr. 502; 520-521.)

In sum, we conclude that the totality of the evidence supports the ALJ's finding that Plaintiff's hypertension, migraine headaches, and carpal tunnel syndrome were not severe. As noted above, the burden is on the claimant to establish the severity of his impairment(s) at step two of the sequential analysis. It is not sufficient merely to establish the presence of a disease or condition; rather, "the evidence must demonstrate that the disease or impairment has caused functional limitations that prevent the claimant from engaging in any substantial gainful activity." Alexander v. Shalala, 927 F.Supp. 785, 792 (D. N.J. 1995). Contrary to Plaintiff's contention that the ALJ "summarily" found that hypertension, migraine headaches, and carpal tunnel syndrome

were not severe impairments, we find that Judge Abruzzo thoroughly analyzed the medical evidence of record before reaching his decision.  We also conclude that Plaintiff failed to establish that these impairments, even when considered with other impairments which the ALJ did consider severe, significantly affected his physical ability to perform basic work activities.

Having considered each of the arguments raised by Plaintiff in the brief in support of his motion for summary judgment, we find none of those arguments persuasive and conclude that the ALJ's decision that Mr. Wukovich was not disabled is based on substantial evidence.  Plaintiff's motion for summary judgment in his favor is therefore denied.  An appropriate Order follows.

April __*12*__ , 2007

William L. Standish
United States District Judge

cc:   Barbara J. Artuso
      Quatrini, Rafferty & Galloway
      550 East Pittsburgh Street
      Greensburg, PA 15601
      Email: bja@qrglaw.com

      Paul Kovac
      United States Attorney's Office
      700 Grant Street
      Suite 4000
      Pittsburgh, PA 15219
      Email: paul.kovac@usdoj.gov